IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Criminal Action No. 2:16-CR-038-D |
| VS. | § | |
| | § | |
| DANIEL GASTELUM RAMOS, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Daniel Gastelum Ramos ("Ramos") moves to suppress all evidence seized on April 12, 2016 following the stop of his vehicle. Following an evidentiary hearing, and for the reasons that follow,[1] the court grants the motion.

I

On April 12, 2016 Potter County Deputy Sheriff Dustin Lansbury ("Deputy Lansbury") was patrolling Interstate Highway 40 when he observed a possible traffic violation. While traveling 115 mph to catch up to the possible violator, Deputy Lansbury observed a second alleged traffic violation—the one at issue here. Deputy Lansbury estimated that this violation occurred at a distance of approximately the length of a football field (i.e., 300 feet) in front of him. According to Deputy Lansbury, he observed a blue Nissan Sentra in the left lane pass a passenger truck in the right lane and then move back into

_____

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

the right lane in front of the truck.[2]  Deputy Lansbury stopped the driver of the Nissan Sentra (later identified as Ramos) for cutting the truck off after passing, in violation of Tex. Transp. Code Ann. § 545.053(a) (West 2011).  According to the incident report, immediately after the lane change, Deputy Lansbury estimated that the distance between the Nissan Sentra and the truck was approximately one to two car lengths, and after Deputy Lansbury pulled up beside the truck, he estimated that there were approximately two car lengths between Ramos' vehicle and the trailing truck.  During the stop, Deputy Lansbury received Ramos' consent to search his vehicle, and he discovered more than five kilograms of methamphetamine. Ramos was charged with possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii).

Ramos now moves to suppress all evidence, including the seized contraband, photographs, and statements made by him, gathered as a result of the traffic stop on April 12, 2016.  The government opposes the motion.  The court conducted an evidentiary hearing on

---

[2]Ramos' counsel asserted at the hearing that Ramos observed a vehicle (later determined to be Deputy Lansbury's patrol car) speeding in the left lane behind him, and that he changed lanes to avoid a collision.  Ramos contends that Deputy Lansbury created a condition that forced Ramos to violate the law: that is, by speeding at 115 mph in the left lane, Deputy Lansbury created the necessity for Ramos to change lanes when he did.  Ramos' counsel maintains that the court will set a dangerous precedent if it allows such behavior by a law enforcement officer.

Ramos has not offered any proof, however, that he observed a vehicle rapidly approaching from behind him.  Because no evidence was presented at the hearing that would support the finding that Ramos observed a vehicle rapidly approaching from the rear, much less that he changed lanes due to the speed of the vehicle, there is no factual support for this theory.  Ramos' arguments for suppression that assume Deputy Lansbury's own conduct caused Ramos to change lanes as he did lack force.

August 3, 2016.

II

The Fourth Amendment protects individuals against unreasonable searches and seizures.  Traffic stops are deemed seizures for the purposes of the Fourth Amendment.  Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit of the poisonous tree" doctrine.  *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)).  "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)).  One such exception comes from *Terry v. Ohio*, 392 U.S. 1 (1968).  *Id.*

The framework articulated in *Terry* is used to analyze the legality of a traffic stop.  "Under the two-part *Terry* reasonable suspicion inquiry, we ask whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'"  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20).

> For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.

*United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (quoting *Lopez-Moreno*, 420 F.3d at 430) (internal quotations marks and some citations omitted).

"The government bears the burden of establishing by a preponderance of the evidence two elements under *Terry*: that the stop was justified at its inception and that the Fourth Amendment intrusions were reasonably related in scope to the circumstance that justified the interference in the first place." *Id.* (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992) (addressing warrantless search of home) ("Because a warrantless search is presumed to be unreasonable, the Government has the burden of proving that the warrantless search was conducted pursuant to an exception.")).

- 4 -

III

Deputy Lansbury stopped Ramos for cutting the passed truck off after passing it, in violation of Tex. Transp. Code Ann. § 545.053(a), which states: "[a]n operator passing another vehicle: (1) shall pass to the left of the other vehicle at a safe distance; and (2) may not move back to the right side of the roadway until safely clear of the passed vehicle." The dispositive question presented by Ramos' motion is whether, at the time of the stop, Deputy Lansbury had an objectively reasonable suspicion that Ramos' vehicle was not "safely clear" of the passed truck when he moved back to the right side of the roadway into the right lane.

A

The government maintains that Deputy Lansbury had reasonable suspicion to stop Ramos for violating § 545.053(a). Deputy Lansbury testified that he has been employed with the Potter County Sheriff's Office since 2008, has been working in traffic enforcement since 2013, and regularly patrols Interstate Highway 40 in Potter County. Deputy Lansbury also testified that the language "until safely clear of the passed vehicle" is not specifically defined under the Texas Transportation Code, and that there is no set rule for determining when a passing vehicle is safely clear of a passed vehicle. He testified that officers follow the rule of thumb that a safe distance between vehicles traveling at highway speeds is two to three seconds between passing of the same fixed object, because this amount of time permits the trailing vehicle to stop in the event that the leading vehicle stops. Additionally, the government introduced in evidence a pamphlet prepared by the Texas Department of Public Safety entitled "How to Prepare for a Driving Test," that instructs drivers to follow the "two-

second rule" to ensure they are following at a safe distance.

Following this rule of thumb, the government maintains that, even assuming the truck was traveling at 60 mph (or 88 feet per second)—i.e., 15 mph under the 75 mph speed limit—a safe distance between the vehicles would have been at least 176 feet (based on a two-second interval) to 264 feet (based on a three-second interval). Deputy Lansbury testified that he observed Ramos violate the two-to-three-second rule; that he observed one to two car lengths (20 to 40 feet) between Ramos' vehicle and the truck when Ramos moved back into the right lane; and that, when he caught up to the truck, he estimated there were two car lengths (40 feet) between the vehicles. He also testified that, after observing the dash camera video from his patrol car that was played during the evidentiary hearing, he believed Ramos' vehicle was at most 40 to 60 feet in front of the passed truck at the time he reached the truck, although he later conceded that the actual distance between the vehicles at this time was 120 feet.

The government posits that, although the dash camera video does not clearly show the distance between Ramos' vehicle and the passed truck at the time Ramos moved back into the right lane, Ramos was closer to the truck at the time he moved back into the right lane than he was when Deputy Lansbury caught up to the truck. And it maintains that Deputy Lansbury was able to see the alleged traffic violation more clearly than is depicted in the video. Finally, the government contends that, even if the court were to credit Ramos' estimate (120 feet) over Deputy Lansbury's estimate (20 to 40 feet), Ramos would still have violated the two-second rule, making Ramos not "safely clear" of the truck when he moved

back to the right lane after passing the truck.

Ramos counters that Officer Lansbury did not have reasonable suspicion to stop him for violating § 545.053(a) because he was "safely clear" of the passed truck when he moved back into the right lane. Ramos maintains that the Texas Transportation Code does not state the amount of feet required to be considered "safely clear of the passed vehicle" because what is "safely clear" is fact dependent. As support, Ramos points to the Texas Driver Handbook, which instructs passing vehicles to "[a]void cutting in too quickly if you must return to your original lane," and to "not return to the right lane until you have safely cleared the overtaken vehicle." Tex. Dep't Pub. Safety, *Texas Driver Handbook* (rev. 2016).

Ramos also maintains that Deputy Lansbury—who was traveling at the speed of 115 mph to catch up to another potential traffic violation and was approximately 300 feet away from Ramos when he moved back to the right lane—could not have determined that Ramos was not safely clear of the passed truck at the time he changed lanes. Ramos points out that Deputy Lansbury's dash camera video shows that the passed truck did not deviate from its path of travel before, during, or after Ramos changed lanes, and that the truck did not apply its brakes when Ramos moved back to the right lane after passing the truck. Ramos also contends that the dash camera video shows that, when Deputy Lansbury caught up to the truck, the distance between Ramos' vehicle and the truck was approximately six car lengths (120 feet).[3] Accordingly, Ramos contends that Deputy Lansbury's estimate of the distance

---

[3]Ramos' estimate is based on approximately three white highway lines between the two vehicles, as depicted on the dash camera video. He points out that Section 3A.06 of the

between his vehicle and the passed truck (and thus his belief that Ramos violated § 545.053(a)) was not objectively reasonable, and therefore the seizure of Ramos and subsequent search violated the Fourth Amendment.

B

The court finds that the government has not met its burden of proving the first *Terry* element: that the stop was justified at its inception. To be sure, Deputy Lansbury testified to some specific, articulable facts supporting a reasonable suspicion that Ramos violated § 545.053(a). He testified about his training and experience, such as his two years' experience in traffic enforcement.[4] And he estimated that, immediately after Ramos changed lanes, the distance between Ramos' vehicle and the passed truck was approximately one to two car lengths, and that after he caught up to the truck, there were approximately two car lengths between the vehicles.[5]

_____

Federal Highway Administration's Manual on Uniform Traffic Control Devices (2009 ed.), which he introduced during the hearing, states that these broken, white lines are 10 feet long with 30 feet gaps in between them. Thus he estimates that there were at least 120 feet between his vehicle and the truck at this time. Because a car length is approximately 20 feet, Ramos asserts that the dash camera video establishes that there were approximately six car lengths between his vehicle and the truck.

[4]*See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (explaining that analysis of reasonable suspicion must allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

[5]*See United States v. Flores-Manjarez*, 421 Fed. Appx. 407, 409 (5th Cir. 2011) (per curiam) (holding officer's testimony that "he observed [defendant] following another vehicle too closely, especially given the wet road conditions," and that he "estimated that [defendant's] Nissan Sentra was traveling less than two car lengths behind the other vehicle"

But the court finds that Deputy Lansbury lacked an objectively reasonable suspicion that Ramos' vehicle was not "safely clear" of the passed truck when Ramos moved back to the right side of the roadway, because Deputy Lansbury was unable to observe the distance between Ramos' vehicle and the passed truck at the time Ramos moved into the right lane, and he lacked other objective bases to suspect that Ramos' vehicle was not "safely clear" of the passed truck. When Deputy Lansbury observed Ramos change back into the right lane, Deputy Lansbury was traveling at 115 mph, was focused on another alleged traffic violation, was attempting to catch up to the other alleged violator, and was trailing approximately one football foot (300 feet) behind Ramos' vehicle, in the left lane. This combination of facts makes it doubtful that, despite Deputy Lansbury's training and experience, he could have observed the distance between Ramos' vehicle and the passed truck at the time Ramos returned to the right lane. And the objective unreasonableness of his suspicion that Ramos was not "safely clear" of the passed truck is corroborated by the dash camera video that shows that, when Deputy Lansbury caught up to the truck, the distance between Ramos' vehicle and the passed truck was approximately six car lengths (120 feet). Moreover, Deputy Lansbury lacked other objective evidence that Ramos was not "safely clear" of the passed

---

constituted specific, articulable facts, which were uncontradicted, that justified reasonable suspicion that defendant had followed too closely, in violation of Tex. Transp. Code Ann. § 545.062(a)); *United States v. Velasco-Garcia*, 2010 WL 4878817, at *3 (S.D. Tex. Nov. 23, 2010) (finding traffic stop justified at its inception because officer credibly testified that defendant was traveling too closely behind another vehicle—specifically, one car length behind—in violation of Tex. Transp. Code Ann. § 545.062(a), and defendant did not offer any evidence to contradict this testimony).

truck when he returned to the right lane.  The dash camera video shows that the passed truck did not apply its brakes, swerve, or otherwise deviate from its course of travel when Ramos' vehicle moved back into the right lane.  *See United States v. Gipson*, 2013 WL 6027908, at *2-3 (N.D. Tex. Nov. 14, 2013) (Kinkeade, J.) (concluding that "officer's conclusionary testimony and inconclusive [dash camera] video"—that showed "no landmarks to assist in determining the distance [defendant's] car traveled"; "visibility issues"; and "that [defendant's] car [was] a significant distance down the road from [officer's] police cruiser"—were insufficient to establish "a particularized, reasonable ground for belief that [defendant's] car failed to signal as required by the Texas Transportation Code").  The government therefore failed to prove by a preponderance of the evidence that Deputy Lansbury had an objectively reasonable suspicion that Ramos' vehicle was not "safely clear" of the passed truck when Ramos moved back to the right side of the roadway.  Because the government failed to prove that the stop of Ramos was justified at its inception, the evidence obtained pursuant to the stop must be suppressed.

* * *

For the reasons explained, the court grants Ramos' motion to suppress.

**SO ORDERED**.

August 9, 2016.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 10 -